BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WENSHUANG LUO, Derivatively on Behalf of Nominal Defendant BIOAGE LABS, INC., <br><br> Plaintiff, <br><br> v. <br><br> KRISTEN FORTNEY, JEAN-PIERRE GARNIER, DOV GOLDSTEIN, SHANE BARTON, MICHAEL DAVIDSON, PATRICK ENRIGHT, JAMES HEALY, REKHA HEMRAJANI, ERIC MORGEN, and VIJAY PANDE, <br><br> Defendants, <br><br> and <br><br> BIOAGE LABS, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

### <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Wenshuang Luo ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant BioAge Labs, Inc. ("BioAge" or the "Company"), against members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding BioAge, legal filings, news reports, securities analysts' reports about the Company, the securities class action captioned *Soto v. BioAge Labs, Inc., et al.*, Case No. 3:25-cv-00196 (N.D. Cal.) (the "Securities Class Action"), and other publicly available information.

### <u>NATURE OF THE ACTION</u>

1.     This is a shareholder derivative action brought by Plaintiff on behalf of BioAge against the Individual Defendants,[1] certain of its officers and members of the Company's Board, for breaches of their fiduciary duties and violations of federal securities laws, as set forth below.

2.     BioAge introduced itself to investors during its initial public offering ("IPO") as a "clinical-stage biopharmaceutical company" that develops therapeutic product candidates for metabolic diseases, such as obesity, by targeting the biology of human aging.

3.     BioAge's lead product candidate, azelaprag, is an orally available small molecule agonist of the apelin receptor APJ. Apelin is an exercise-induced signaling molecule (exerkine) that acts on APJ and has the potential to recapitulate the metabolic benefits of exercise.

4.     The IPO documents discussed its collaboration with Eli Lilly and Company ("Lilly")

---

[1] The Individual Defendants are Kristen Fortney, Jean-Pierre Garnier, Dov Goldstein, Shane Barton, Michael Davidson, Patrick Enright, James Healy, Rekha Hemrajani, Eric Morgen, and Vijay Pande.

in connection with its ongoing STRIDES clinical trial of azelaprag in combination with GLP-1R agonists to establish proof of concept for enhanced weight loss. Under the terms of the collaboration, Lilly agreed to supply tirzepatide and Lilly's Chorus provided clinical trial design and execution advice.

5.    Under the STRIDES trial, azelaprag in combination with tirzepatide was given to approximately 220 obese individuals aged 55 and over.  The goal of the STRIDES clinical trial was to establish proof of concept for enhanced weight loss with its primary endpoint of weight loss at 24 weeks. Defendants anticipated topline results in the third quarter of 2025.

6.    BioAge completed its IPO on September 27, 2024, selling 12.65 million shares at $18 per share, which included the exercise in full by the underwriters of their option to purchase 1.65 million additional shares. However, less than three months later, on December 6, 2024, BioAge announced that it would discontinue the ongoing STRIDES Phase 2 study of its investigational drug candidate azelaprag after liver transaminitis was observed in some subjects receiving azelapgrag. In response to the news, BioAge's stock price declined from $20.09 per share on December 6, 2024 to $4.65 per share on December 7, 2024.

7.    The Individual Defendants touted azelaprag in connection with the Company's ongoing clinical trial with expectations of topline results in 2025; mentioned its collaboration with Lilly's Chorus clinical development organization who would be advising and assisting on all aspects of the trial design and execution; and further discussed the potential for a second Phase 2 clinical trial to treat obesity in individuals ages 18 years and older.

8.    The IPO represented to the public that there were no safety concerns and the Company expected top line results and to meet its primary endpoint goals in connection with its STRIDES clinical trial. Contrary to these representations, BioAge discontinued the ongoing STRIDES Phase 2 study of its investigational drug candidate azelaprag after several subjects showed elevated levels of liver enzymes warning of potential organ damage. As a result, the Individual Defendants discontinued the clinical trial and halted further enrollment.

9.    As a result of the foregoing, the Securities Class Action was filed against the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company and certain of its executive officers, exposing the Company to costs and massive class-wide liability.

10.     Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78u-4(f)), and Section 11(f) of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77k(f)(1)).

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

16.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**PARTIES**

*Plaintiff*

17.    Plaintiff is, and has been at all relevant times, a shareholder of BioAge.

*Nominal Defendant*

18.    Nominal Defendant BioAge is incorporated under the laws of Delaware with its principal executive offices located at 1445A South 50th Street, Richmond, California.

*Individual Defendants*

19.    Defendant Kristen Fortney ("Fortney") has served as BioAge's Chief Executive Officer and a member of the Board since the Company's inception in April 2015.

20.    Jean-Pierre Garnier ("Garnier") has been Chair of the Board since August 2024, when he succeeded James Healy, who remained on the Board.

21.    Michael Davidson ("Davidson") has served as a member of the Board since March 2024.

22.    Patrick Enright ("Enright") has served as a member of the Board since February 2024. Enright is a member of the Audit Committee.

23.    James Healy ("Healy") served as Chair of the Board at relevant times until August 2024 and currently serves as a member of the Board.

24.    Rekha Hemrajani ("Hemrajani") has served as a member of the Board since August 2021. Hemrajani is a member of the Audit Committee.

25.    Eric Morgen ("Morgen") has served as a member of the Board since June 2017, as the Company's Chief Medical Officer from February 2018 to April 2020, and as the Company's Chief Operating Officer since May 2018.

26.    Vijay Pande ("Pande") has served as a member of the Board since June 2017. Pande is a member of the Audit Committee.

27.    Defendant Dov Goldstein ("Goldstein") was at all relevant times BioAge's Chief Financial Officer.

28.    Defendant Shane Barton ("Barton") was at all relevant times BioAge's Vice President of Finance.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

29.    By reason of their positions as officers and/or directors of BioAge, and because of their ability to control the business and corporate affairs of BioAge, the Individual Defendants owed BioAge and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage BioAge in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of BioAge and its shareholders so as to benefit all shareholders equally.

30.    Each director and officer of the Company owes to BioAge and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of BioAge, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.    To discharge their duties, the officers and directors of BioAge were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

33.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of BioAge, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual

Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty: to ensure that BioAge implemented and properly monitored the Company's internal controls; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

35.    To discharge their duties, the officers and directors of BioAge were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of BioAge were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to BioAge's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how BioAge conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of BioAge and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that BioAge's publicly disclosed financial information would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

36. Each of the Individual Defendants further owed to BioAge and the shareholders the duty of loyalty requiring that each favor BioAge's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

37. At all times relevant hereto, the Individual Defendants were the agents of each other and of BioAge and were at all times acting within the course and scope of such agency.

38. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein,

as well as the contents of the various public statements issued by BioAge.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

40.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

41.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

42.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of BioAge, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

44.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of BioAge and at all times acted within the course and scope

of such agency.

## BIOAGE'S CODE OF CONDUCT

45.     With respect to legal compliance, BioAge's Code of Conduct states:

Everyone at the Company is expected to comply with the law. Laws can be complex and at times, even counterintuitive. Although it's impossible to know all aspects of every law, you should understand the major laws, rules and regulations that apply to your work. You should consult with our Compliance Officer if you are unsure or have any questions or concerns related to your work. A few specific areas of legal compliance are discussed in greater detail below.

46.     With respect to Patient Safety, Product Quality, Adverse Event Reporting, the Code of Conduct states:

You must ask questions or report concerns regarding product quality or safety, including concerns related to research and development activities or good manufacturing practices to our Compliance Officer. Additionally, you must promptly report any adverse events of which you become aware, regardless of how, where or when you learned the information.

47.     With respect to Clinical Trials, the Code of Conduct states:

We comply with all laws and regulations related to the conduct of clinical trials. We also disclose and communicate our scientific data and results in a timely and accurate manner, including listing clinical trial protocols on the www.ClinicalTrials.gov website. It is important that the information you disclose, and review is accurate. If you become aware of any inaccuracies or other factors that could make the disclosed information misleading, please notify your manager or our Compliance Officer immediately. Similarly, if you become aware of any misconduct or noncompliance with applicable laws occurring in connection with any of our studies or trials, please notify your manager or our Compliance Officer.

48.     With respect to Regulatory Compliance, the Code of Conduct states:

We operate in a highly regulated environment. The agencies that regulate our business include the FDA, or other comparable foreign regulatory authorities, and many other federal, state and local agencies. You must comply with the regulatory requirements of these

agencies to the extent applicable to our activities, and you are expected to take an active role by being knowledgeable about all applicable laws and regulations, attending trainings, and requesting information. Please immediately report regulatory violations, suspected regulatory violations, or potentially harmful or dangerous conditions to our Compliance Officer.

49.     With respect to Financial Matters and Business Practices, and Financial Statement Preparation, the Code of Conduct states:

You are expected to act responsibly and exercise sound judgment with respect to our finances and financial and other public reporting. Investors rely on accurate and fair financial and business information to understand our financial results and make informed decisions. You may execute financial transactions only with authorization and in compliance with our policies. You also are expected to record and report all financial transactions and business information honestly and accurately, to comply with our system of internal controls and to follow applicable laws, regulations and accounting practices.

If you contribute in any way to the preparation or verification of our financial statements and other financial information, you must ensure that our books, records and accounts are accurately maintained. You must also cooperate fully with our finance department, as well as our independent public accountants and counsel.

50.     The Code of Conduct states further that:

We are committed to providing accurate, timely and clear disclosure in our public communications. Because any external communications can affect our business, you must be thoughtful and conscientious about what you say and write in public on the Company's behalf. In general, only people who have been specifically authorized may speak on behalf of the Company without prior approval. If you are approached by anyone such as a member of the press, analyst, or current or potential investor of the Company, please refer the individual to our Chief Executive Officer or our Chief Financial Officer. For additional information, please refer to our Corporate Communications Policy.

51.     With respect to Cooperating with Investigations, the Code of Conduct states that "[w]e will conduct investigations of alleged or actual violations of our policies, procedures and laws, rules and regulations. All persons subject to this Code are required to cooperate with any

Company investigation."

## BIOAGE'S AUDIT COMMITTEE CHARTER

52.     Pursuant to BioAge's Audit Committee Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities relating to: (a) the Company's accounting and financial reporting processes and internal controls, including audits and the integrity of the Company's financial statements; (b) thee qualifications, independence and performance of the Company's independent auditors; (c) risk assessment and management; and (d) compliance by the Company with legal and regulatory requirements.

53.     Among other duties and responsibilities, the Audit Committee Charter states that the Committee will:

> Prior to distribution to the public, review and discuss with management and the Independent Auditors, the Company's quarterly and annual financial results, earnings press releases and earnings guidance provided to analysts and rating agencies, and other public announcements regarding the Company's operating results.

> Review and discuss the following with management and the Independent Auditors, as applicable:

>> the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K;

>> the results of the Independent Auditors' audit or review of the financial statements;

>> all critical audit matters (CAMs) proposed by the Independent Auditor to be included in the Independent Auditor's annual audit report, if applicable;

>> any items required to be communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB"); and

any significant issues, events and transactions, as well as any significant

54.    With respect to the Company's internal controls, the Audit Committee Charter states that the Committee will:

> Review and discuss with the Company's management and the Independent Auditors, and provide oversight over, the design, implementation, adequacy and effectiveness of the Company's accounting and financial processes and systems of internal controls and material changes in such controls, including any control deficiencies, significant deficiencies and material weaknesses in their design or operation.

> Review any allegations of fraud that are disclosed to the Committee involving management or any employee of the Company with a significant role in the Company's accounting and financial reporting process and systems of internal controls.

> Discuss any comments or recommendations of the Independent Auditors outlined in their annual management letter or internal control reports.

> Periodically consult with the Independent Auditors out of the presence of the Company's management about internal controls, the fullness and accuracy of the Company's financial statements and any other matters that the Committee or the Independent Auditors believe should be discussed privately with the Committee.

55.    With respect to Risk Oversight and Compliance, the Audit Committee Charter states that the Committee will:

> Review with management the Company's major financial risks and enterprise exposures and the steps management has taken to monitor or mitigate such risks and exposures, including the Company's procedures and any related policies with respect to risk assessment and risk management.

> Review with management the Company's cybersecurity and other information technology risks, controls and procedures, including the Company's plans to mitigate cybersecurity risks and respond to data breaches.

> Review with management the Company's risk exposures in other areas, as the Committee deems necessary or appropriate

from time to time.

Review and establish any appropriate changes to the Company's investment policies, as the Committee deems necessary or appropriate from time to time.

Review with management the Company's (a) programs for promoting and monitoring compliance with applicable legal and regulatory requirements, and (b) major legal and regulatory compliance risk exposures and the steps management has taken to monitor or mitigate such exposures.

Review the status of any significant legal and regulatory matters and any material reports or inquiries received from regulators or government agencies that reasonably could be expected to have a significant impact on the Company's financial statements.

## **SUBSTANTIVE ALLEGATIONS**

56.    On October 26, 2023, Defendants issued a press release announcing plans to initiate a Phase 2 trial of its oral apelin receptor agonist BGE-105 (azelaprag) co-administered with the GLP-1/GIP receptor agonist tirzepatide for treatment of obesity.  In the same press release, Defendant Fortney stated, in relevant part:

We are thrilled to work directly with the clinical development experts at Chorus and benefit from Lilly's expertise in obesity drug development. Our Phase 2 trial is designed to assess whether azelaprag can substantially increase the weight loss achieved with drugs of the incretin class. This combination could enhance the performance of both injectable and oral incretin drugs. The oral route of administration of azelaprag makes it particularly exciting as a combination partner for next-generation oral incretins currently in development. As an additional benefit, azelaprag may help promote healthier weight loss. Treating obesity has the potential to prevent or delay multiple diseases of aging and increase healthspan for a large segment of the population.

57.    The press release further stated that in December 2022, BioAge announced positive topline results from a Phase 1b clinical trial showing that azelaprag treatment resulted in statistically significant prevention of muscle atrophy and maintenance of muscle protein synthesis in healthy

volunteers aged 65 or older after 10 days of strict bed rest. "Azelaprag was well tolerated in this study and at all doses tested to date in 227 subjects, with a safety profile consistent with the findings of prior phase 1 trials conducted by Amgen."

58.    On July 29, 2024, Defendants issued a press release that the that the first patient had been dosed in the STRIDES Phase 2 clinical trial evaluating BioAge's lead product candidate azelaprag in combination with tirzepatide for the treatment of obesity in adults aged 55 and older.

59.    The press release further stated, in relevant part:

> STRIDES is a randomized, double-blind, placebo-controlled Phase 2 clinical trial of azelaprag in combination with tirzepatide that will enroll approximately 220 obese individuals aged 55 years and older. The trial will evaluate the efficacy, safety, and tolerability of two oral doses of azelaprag (300 mg once or twice daily) in combination with tirzepatide (5 mg subcutaneous injection once weekly). The primary endpoint is mean percent change in body weight at 24 weeks. Additional exploratory endpoints include body composition, glycemic control, obesity-related biomarkers, and patient-reported outcomes related to health and quality of life. Top-line results are anticipated in the fourth quarter of 2025.

60.    In the same press release, Defendant Fortney stated, in pertinent part:

> We believe combining azelaprag, an exercise mimetic, with tirzepatide, a GLP-1/GIP receptor agonist that decreases food intake, could provide a powerful pharmacological parallel to the exercise and diet interventions that form the foundation of obesity management. The STRIDES trial aims to demonstrate that activating apelin signaling with azelaprag is a potent complementary mechanism that can deliver increased weight loss efficacy in patients on incretins. In addition, this trial will provide a direct read-through to azelaprag's potential as an orally available small molecule to achieve efficacy on par with injectable weight loss drugs when combined with incretins in an all-oral regimen.

61.    On November 7, 2024, Defendants issued a press release in which Defendant Fortney reiterated the importance of BioAge's Phase 2 STRIDES stating, "The STRIDES trial is a critical step in our mission to improve outcomes for patients with obesity. We're developing an oral therapy that has the potential to enhance the weight loss benefits of incretin drugs while promoting

healthy body composition."

62.    On September 3, 2024, Defendants filed a registration statement on Form S-1 with the SEC in connection with the Company's initial public offering. BioAge amended the registration statement on September 18, 2024 and September 25, 2024. On September 26, 2024, BioAge filed its final prospectus for the Company's initial public offering, which was incorporated into the registration statement, and listed for sale 11 million shares of BioAge common stock at an offering price of $18 per share.

63.    BioAge's final prospectus for the initial public offering represented the significance and benefits of azelaprag for the treatment of obesity in older adults.  In pertinent part, the Company detailed the arrangement as follows:

> We are a clinical-stage biopharmaceutical company developing therapeutic product candidates for metabolic diseases, such as obesity, by targeting the biology of human aging. Our technology platform and differentiated human datasets enable us to identify promising targets based on insights into molecular changes that drive aging. Our primary focus is metabolic disease, one of the greatest global healthcare challenges. Azelaprag, our lead product candidate, is an orally available small molecule that has been well-tolerated in 265 individuals across eight Phase 1 clinical trials. In preclinical obesity models, azelaprag demonstrated the ability to more than double the weight loss induced by a glucagon-like-peptide-1 receptor (GLP-1R) agonist while also restoring healthy body composition and improving muscle function. These preclinical results are supported by our Phase 1b clinical trial in older adults on bed rest where we observed decreased muscle atrophy, preservation of muscle quality and improved metabolism in subjects treated with azelaprag over a 10-day period. We plan to assess azelaprag's potential to drive significant improvements in weight loss when combined with a GLP-1R agonist in two Phase 2 clinical trials. While the results of these preclinical studies and early clinical trials have demonstrated the potential use of azelaprag for the treatment of metabolic disease, they may not be predictive of the results of later-stage clinical trials. The ongoing STRIDES clinical trial will assess azelaprag in combination with tirzepatide, marketed as Zepbound® by Eli Lilly (Lilly), with topline results anticipated in the third quarter of 2025.

***

We are building a pipeline of platform-derived therapeutics targeting chronic metabolic disease. Our lead product candidate, azelaprag, is an orally available small molecule agonist of the apelin receptor (APJ) where activation has the potential to recapitulate many of the benefits of exercise. We are developing azelaprag for the treatment of obesity in combination with GLP-1R agonists with the goal of increasing overall weight loss, with the potential to also improve tolerability and body composition. We have initiated one Phase 2 clinical trial of azelaprag in combination with tirzepatide and plan to initiate a second Phase 2 clinical trial of azelaprag in combination with semaglutide in the first half of 2025 and topline results expected in the second half of 2026.

\*\*\*

We are initiating two Phase 2 clinical trials of azelaprag in combination with GLP-1R agonists. The first of these trials, STRIDES, is an ongoing clinical trial of azelaprag in combination with tirzepatide in approximately 220 obese individuals aged 55 and over, an age group that represents 35-40% of the adult obese population in the U.S. We are initially focusing on these older patients because the muscle and metabolic benefits of azelaprag observed in our Phase 1b clinical trial were achieved in older patients. The goal of the STRIDES clinical trial is to establish proof of concept for enhanced weight loss. The primary endpoint of this trial will be weight loss at 24 weeks. In addition, biomarkers, changes in body composition and glucose control will be assessed as exploratory endpoints. We anticipate topline results in the third quarter of 2025.

\*\*\*

We have a material transfer agreement with Lilly, under which Lilly has agreed to provide us with tirzepatide in connection with our STRIDES clinical trial of azelaprag in obesity. Lilly's Chorus clinical development organization is advising and assisting on all aspects of the Phase 2 STRIDES clinical trial design and execution, enabling us to benefit from Lilly's extensive clinical experience in this space, while retaining all rights to azelaprag.

\*\*\*

The ongoing STRIDES clinical trial is the first of these and aims to establish proof of concept in obesity and evaluate the ability of azelaprag to enhance weight loss in combination with tirzepatide in adults aged 55 and above with obesity, an age group that represents 35-40% of the adult obese population in the U.S. We chose to initially establish proof of concept in these older patients given the strong

16
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

muscle and metabolic benefits of azelaprag observed in our Phase 1b clinical trial in older patients.

We have selected a 5 mg dose of tirzepatide in the STRIDES clinical trial given it approximates oral efficacy. Our ultimate goal is to develop azelaprag as part of an all-oral obesity combination therapy. The 5 mg dose of tirzepatide achieves similar weight loss as the most advanced oral in development, oral semaglutide. Tirzepatide 5 mg achieved 15.0% overall weight loss at 72 weeks; oral semaglutide 50 mg, achieved 15.1% weight loss after 68 weeks.

We plan to investigate two doses of azelaprag, 300 mg QD and 300 mg BID (which has potential for 600 mg QD dose formulation) in combination with tirzepatide as compared to tirzepatide alone. The doses were selected based on a completed Phase 1 oral pharmacokinetic trial; they are intended to result in azelaprag exposures (area under the curve) that bracket the similar exposure achieved in the Phase 1b bed rest trial and diet-induced obesity preclinical studies. These doses will be administered orally in combination with weekly subcutaneous tirzepatide. We are collaborating with Lilly's Chorus clinical development organization, which will provide clinical trial design and execution expertise, and Lilly, which is supplying tirzepatide. We retain all rights to azelaprag.

***

The primary endpoint of the STRIDES clinical trial is mean percent weight loss at 24 weeks with exploratory endpoints focused on body composition, glycemic control, patient-reported outcomes / quality of life, biomarkers, and rebound weight gain. We set the primary endpoint at 24 weeks because there is lower variability in tirzepatide monotherapy weight loss compared to later time points in clinical trials, and because Lilly has found weight loss at 24 weeks to be predictive for weight loss at 72 weeks (one year of treatment once the maintenance dose is reached). The trial has 90% power to detect a 3.3% difference between treatment groups (azelaprag plus tirzepatide versus tirzepatide alone) in weight loss at 24 weeks of treatment, which is expected to correspond to 5% at one year of treatment. FDA's 2007 draft guidance for development of weight management products states that a 5% treatment difference compared to placebo can be evidence of effectiveness in Phase 3 trials. A 5%+ benefit in weight loss for azelaprag could also translate into potential 20%+ overall weight loss in an oral combination, a competitive efficacy benchmark; for reference, the most advanced oral incretin in development, oral semaglutide, achieves 15.1% overall weight loss at 68 weeks.   We anticipate topline results from this trial in the third quarter of 2025.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

64. The statements identified above were false and/or materially misleading. Defendants touted its lead product candidate azelaprag in connection with the Company's ongoing STRIDES with expectations of topline results in 2025. Defendants also mentioned its collaboration with Lilly's Chorus clinical development organization who would be advising and assisting on all aspects of the STRIDES trial design and execution. Defendants further discussed the potential for a second Phase 2 clinical trial combining azelaprag and semaglutide to treat obesity in individuals ages 18 years and older. Therefore, the initial public offering represented to the public that there were no safety concerns and the Company expected top line results and to meet its primary endpoint goals in connection with its STRIDES clinical trial.

65. Contrary to these representations, BioAge discontinued the ongoing STRIDES Phase 2 study of its investigational drug candidate azelaprag after several subjects showed elevated levels of liver enzymes warning of potential organ damage. As a result, Defendants discontinued the clinical trial and halted further enrollment. Given the fact that Defendants failure to disclose the potential for liver transaminitis in any of its previous clinical Phase 1 trials and various preclinical tox studies, Defendants' statements in BioAge's registration statement were false and/or materially misleading at the time of the initial public offering.

66. Following the announcement, analysts and news outlets reported on the development. In pertinent part, one analyst reported that the news was surprising noting that liver tox never appeared across eight Phase 1 studies conducted previously by BioAge. In response to the news, BioAge's stock price declined from $20.09 per share on December 6, 2024 to $4.65 per share on December 9, 2024.

67. BioAge's stock currently trades at or around $5.82 per share, which is well below its $18 per-share IPO price.

68. The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

69.      The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls, and procedures.

70.      The Individual Defendants breached their fiduciary duties to Owlet because they willfully or recklessly made and/or caused the Company to make the false and/or misleading statements and omissions of material fact described herein.

71.      As a direct and proximate result of the Individual Defendants' misconduct, BioAge has lost and expended, and/or will lose and expend, millions of dollars.

72.      Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

73.      Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

74.      Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

75.      The Individual Defendants' misconduct has also exposed the Company to potential liability relating to civil investigative demands from the federal government.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

76.      Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

77.      BioAge is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

78.      Plaintiff is a current shareholder of BioAge and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

79.     A pre-suit demand on the Board of BioAge is futile and, therefore, excused. At the time this action was commenced, the eight-member Board was comprised of Defendants Garnier, Fortney, Morgen, Davidson, Enright, Healy, Hemrajani, and Pande (the "Director Defendants"). Accordingly, Plaintiff is only required to show that four Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

80.     The Company's proxy statement, filed with the SEC on April 17, 2025, concedes Fortney and Morgen are not independent directors.

81.     The Director Defendants either knew or should have known of the false and misleading statements that were issued (some of which they personally signed) on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

82.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

83.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

84.     Defendants Enright, Hemrajani, and Pande serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosures, internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or

inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

85.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

86.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Specifically, none of the Board's current members have taken remedial action to redress the conduct alleged herein.

87.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

88.    The acts complained of herein constitute violations of fiduciary duties owed by BioAge's officers and directors, and these acts are incapable of ratification.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

89.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of BioAge. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of BioAge, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

90.    If there is no directors' and officers' liability insurance, then the directors will not cause BioAge to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

91.    Thus, for all of the reasons set forth above, all seven, or if not all, then at least five of BioAge's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants
### For Breach of Fiduciary Duty

92.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93.    The Individual Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

94.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

95.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

96.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

97.    Plaintiff, on behalf of BioAge, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

98.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal

conduct complained of herein.

100.    Plaintiff on behalf of BioAge has no adequate remedy at law.

### COUNT III

**Against the Individual Defendants for Unjust Enrichment**

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, BioAge.

103.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from BioAge that were tied to the performance or artificially inflated valuation of BioAge, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

104.    Plaintiff, as a shareholder and a representative of BioAge, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

105.    Plaintiff on behalf of BioAge has no adequate remedy at law.

### COUNT IV

**Against the Individual Defendants for Waste of Corporate Assets**

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

108.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and

(ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

109.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

110.    Plaintiff on behalf BioAge has no adequate remedy at law.

## COUNT V

**Against Defendants Fortney, Goldstein, Barton, Garnier, Davidson, Enright, Healy, Hemrajani, Morgen, and Pande for Contribution Under Section 11(f) of the Securities Act and Section 21D of the Exchange Act**

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.    As a result of the misconduct alleged above, the Company is a defendant in the Securities Class Action, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

113.    Federal law provides BioAge with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

114.    The plaintiff in the Securities Class Action allege that the defendants made numerous untrue statements of material facts and omitted to state material facts necessary to make the statements not misleading in the IPO documents.

115.    BioAge is the registrant for the IPO, and the Individual Defendants named herein were responsible for the contents and dissemination of the IPO documents.

116.    As the issuer of the shares, BioAge is strictly liable to the plaintiffs in the Securities Class Action for the misstatements and omissions alleged therein.

117.    The plaintiff in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO documents were true and not misleading.

118.    The Individual Defendants, because of their positions of control and authority as

officers and directors of BioAge, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of BioAge, including the wrongful acts complained of herein and in the Securities Class Action.

119.    Accordingly, the Individual Defendants are liable pursuant to Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) which creates a private right of action for contribution, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

120.    As such, BioAge is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

121.    Plaintiff on behalf BioAge has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Dated: May 19, 2025

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:    /s/ Alex J. Tramontano
       ALEX J. TRAMONTANO

Betsy C. Manifold (182450)
Rachele R. Byrd (190634)
Alex J. Tramontano (276666)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
Email: manifold@whafh.com
Email: byrd@whafh.com
Email: tramontano@whafh.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
Email: tjm@rl-legal.com
Email: sa@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 267-507-6085
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff*

27
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **<u>VERIFICATION</u>**

I, Wenshuang Luo, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of BioAge Labs, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed ____5/13/2025____.

DocuSigned by:

AEBD0AA2DB3447A...

Wenshuang Luo
